THE STATE OF OHIO, APPELLEE, *v.* LYNCH, APPELLANT.

[Cite as *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284.]

(No. 1999–2248—Submitted February 11, 2003—Decided May 14, 2003.)

MOYER, C.J.

{¶ 1} In this appeal, defendant-appellant, Ralph L. Lynch, raises 22 propositions of law. Finding none meritorious, we affirm his convictions. We have independently weighed the aggravating circumstances against the mitigating

factors and compared his sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm defendant's sentence of death.

{¶ 2} Lynch lived alone in an apartment in Cincinnati. Mary Jennifer Love, a six-year-old girl, lived with her family in a neighboring apartment building and often played in the common area of the apartment complex.

{¶ 3} On June 24, 1998, Lynch invited Love into his apartment, and they watched TV and ate popcorn. Lynch asked to see Love's genitals, and he took off her clothes. Lynch kissed and touched Love's genitals, and she started to scream. He then strangled Love, placed her body in his bathtub, and put his finger into her vagina. Lynch put Love's body into a cardboard box, put the box into his van, and dumped Love's body in a nearby wooded area.

{¶ 4} Lynch was convicted of the aggravated murder of Love and sentenced to death.

### State's case

{¶ 5} In June 1998, Lynch and Love lived in adjoining buildings at apartments on Arborwood Drive. Lynch met Love about one year earlier when she had "handed him flowers in the parking lot" of the apartment complex. Love and other neighborhood girls would sometimes play in Lynch's apartment building in bad weather. Love was described as a "very sweet little girl" who made friends easily and did not consider anybody a stranger.

{¶ 6} On June 23, 1998, Lynch spent 40 to 45 minutes talking to Love on the inside stairway in front of his apartment. Lynch was seated on the steps, and Love was standing in front of him. According to Lynch's confession, "at one point * * * he lifted her up, and when he lifted her up, he leaned back and [while] holding her on an angle * * * her vaginal area was right in his face. And * * * when that happened, he became very excited and he obtained an erection."

{¶ 7} Shortly after 3:00 p.m. on June 24, 1998, Love left her apartment and went outside to play. Love was wearing a one-piece swimming suit, shorts, and brown sandals.

{¶ 8} According to Lynch's confession, around 4:00 p.m., Love entered Lynch's apartment building and Lynch invited her into his apartment. Lynch and Love sat on the floor, watched TV, and ate popcorn. Lynch told Love that he loved her, she gave Lynch a kiss on the cheek, and "that's when the feelings all started," meaning that he got an erection.

{¶ 9} Lynch rubbed Love on the back, kissed her on the neck, and touched her belly button. They moved to his bedroom, and Love sat on the bed. Lynch asked Love if he could "see it," and she pulled her swimming suit to the side to show her genitals. Lynch started "licking * * * and kissing" her genitals, and his tongue went inside her vagina "a little."

{¶ 10} Love started screaming after Lynch touched and kissed her. Lynch told Love not to be afraid and asked her whether he "could see her out of the bathing suit." Lynch then "took the swim suit off of her," and she was completely naked except for her shoes and socks. When Love started screaming again, Lynch strangled her by putting his hands around her neck and squeezing for "approximately * * * three minutes."

{¶ 11} After strangling her, Lynch carried Love into the bathroom and put her in the bathtub. Lynch poured some water into her mouth, and "she gasped and * * * the water went down in her lungs." Lynch concluded that Love was dead. He placed his finger into her vagina and then "started feeling bad about what * * * [he had] just done."

{¶ 12} Lynch went into the kitchen, found a garbage bag, and placed it over Love's head so that he "couldn't see her face." Lynch then took Love's body out of the bathtub and placed her inside a cardboard vacuum cleaner box. Around 5:00 p.m., Lynch left his apartment carrying the cardboard box with Love's body inside. Lynch put the box inside his van and started "riding around looking for some place to dump her body."

{¶ 13} Lynch dumped Love's body in an isolated and wooded area off Breezy Acres Drive, located one and one-half to two miles from Lynch's apartment. Lynch carried the box with Love's body into an area 60 to 70 feet from the road, removed her body from the box, and placed it under a rug that "just happened to be * * * laying [sic] back there." Then, Lynch dumped the cardboard box and Love's shoes and socks in a nearby dumpster. Lynch disposed of Love's swimming suit and shorts at another dumpster in Hamilton, Ohio. Shortly after 8:15 p.m., Lynch returned to his apartment.

{¶ 14} Around 7:30 p.m. on June 24, Carol Williams, the victim's mother, went looking for Love after she had failed to show up for dinner. After Williams and other family members could not find Love, Williams notified the police around 9:00 p.m. that her daughter was missing.

{¶ 15} Around 10:00 p.m. on June 24, police began their search for Love. Additionally, many apartment residents searched for Love around the apartment complex and in a nearby wooded area.

{¶ 16} Lynch joined the search after noticing that people were looking for Love around the apartment complex. During the search, Lynch mentioned to his neighbor, James Doyle, "It's a shame this has happened," and "I wonder where she could have roamed off to."

{¶ 17} On June 26, as the search for Love continued, FBI Special Agent Tracey Heinlein interviewed Lynch as part of a neighborhood canvass. Lynch stated that his last contact with Love was on June 23 when he said hello to her in

the parking lot. However, a neighbor told police that on June 23, he saw Lynch talking to Love on a stairway near Lynch's apartment.

{¶ 18} On June 27, Detective Thomas Corbett interviewed Lynch about discrepancies in his statement to Heinlein. At Corbett's request, the interview was conducted at the police station, where Lynch completed a timeline detailing his whereabouts on June 24.

{¶ 19} On June 27, Detective Dennis Goebel recognized Lynch when Lynch arrived at the police station. While Lynch was being interviewed, Goebel retrieved police records showing that Lynch had a prior conviction for contributing to the delinquency of a minor for exposing himself to two young girls.

{¶ 20} After Corbett learned about Lynch's criminal history, Lynch was advised of his *Miranda* rights and waived those rights. During questioning, Lynch admitted having "a conversation with Mary Love" on the steps inside his apartment building. He admitted grabbing Love while he was seated on the steps, picking her up, becoming very excited, and getting an erection. After police completed their interview, Lynch, who was not under arrest, drove back to his apartment.

{¶ 21} On July 3, police reinterviewed Lynch. After police again advised Lynch of his *Miranda* rights, and he again waived those rights, Lynch denied that he knew anything about Love's disappearance. As Lynch's interview proceeded, the police mentioned the need to find Love, the need for the family to grieve properly, and the need for Love to have a proper burial. Lynch then told the police, "She's on Breezy Acres."

{¶ 22} Police drove Lynch to Breezy Acres Drive. On the way there, Lynch told police, "I choked her. * * * She came up to my apartment, and that's where it happened."

{¶ 23} Lynch provided police with detailed directions on where to find Love's body. He told them, "I put a bag over her head and she'll be wrapped and rolled in a carpet in a wooded area off the highway." Lynch told police, "Stop right here," when they came to the location of Love's body. He pointed through the car window and said, "It's right inside the trees, you'll find a carpet."

{¶ 24} Following Lynch's directions, police went into the woods and found Love's skeletal remains underneath a carpet. A maggot-filled plastic garbage bag was covering the skull. While Lynch was in the police car at the scene, he told police, "I strangled her. I didn't mean to do it. I'm sorry. I need help. I'm sorry I lied to you."

{¶ 25} Police returned with Lynch to police headquarters after discovering Love's remains. Lynch provided a taped, detailed account of the murder and

signed the transcript of his taped confession that reflects the facts already described.

{¶ 26}  Police searched Lynch's apartment and found "an assortment of children's toys, stuffed animals * * * in the bedroom closet on the shelf." A box of popcorn and a roll of black plastic garbage bags were found in the cupboard.

{¶ 27}  After examining Love's remains, Dr. Robert Phalzgraf, Chief Deputy Coroner for Hamilton County, determined that Love was a homicide victim. Because Love's skeletal remains were "perfectly intact" and because of her age, Phalzgraf was able to rule out a "gunshot wound, stab wound, blunt trauma, [or] being struck by a hard object" as the cause of death. Phalzgraf concluded that Love's "cause of death was * * * asphyxia."

{¶ 28}  The defense presented no evidence during the guilt phase.

### Trial result

{¶ 29}  The grand jury indicted Lynch on three counts of aggravated murder. Count 2 charged Lynch with aggravated murder while committing rape, Count 4 charged Lynch with aggravated murder while committing kidnapping, and Count 5 charged Lynch with aggravated murder by purposely causing the death of a child under 13. Additionally, Lynch was indicted for rape in Count 1, kidnapping in Count 3, and gross abuse of a corpse in Count 6.

{¶ 30}  The three counts of aggravated murder each contained four identical death-penalty specifications: murder for the purpose of escaping detection or apprehension for another offense, R.C. 2929.04(A)(3); principal offender in a murder while committing or attempting to commit rape, R.C. 2929.04(A)(7); principal offender in a murder while committing or attempting to commit kidnapping, R.C. 2929.04(A)(7); and principal offender in a murder of a child under 13 years of age, R.C. 2929.04(A)(9).

{¶ 31}  The jury convicted Lynch as charged and recommended the death penalty. Thereafter, the trial court sentenced Lynch to death, life imprisonment for rape, ten years' imprisonment for kidnapping, and 12 months' imprisonment for gross abuse of a corpse, with the sentences to run consecutively.

{¶ 32}  Lynch now appeals to this court as a matter of right.

### Pretrial issues

{¶ 33}  *Change of venue.*  In proposition of law XX, Lynch argues that the trial court erred by failing to grant the defense motion for a change of venue. In support of his claim, Lynch points to extensive pretrial publicity about his case on television, radio talk shows, and in the newspapers. Pretrial publicity disclosed that Lynch confessed, took authorities to the location of the body, and had a prior record of sexually abusing children. Moreover, the Hamilton County Prosecuting

Attorney publicly commented on the case prior to trial, and the Hamilton County Sheriff spoke at the victim's funeral.

{¶ 34} A motion for change of venue is governed by Crim.R. 18(B), which provides, "Upon the motion of any party or upon its own motion the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." However, Crim.R. 18(B) does not require a change of venue merely because of extensive pretrial publicity. Any decision on a change of venue rests in the sound discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St.3d 107, 116–117, 559 N.E.2d 710.

{¶ 35} This court has stated that " 'a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " Id. at 117, 559 N.E.2d 710, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749. Only in rare cases may prejudice be presumed. Id.; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304; see, also, *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554–555, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 36} The trial court found that there was significant "news coverage of * * * the disappearance of Mary Jennifer Love, a search for her over many days, the eventual arrest of the defendant, the recovery of the little girl's body and her funeral." However, review of the voir dire examination does not support Lynch's claim of prejudicial pretrial publicity. During voir dire, eight of the seated jurors were asked individual questions about pretrial publicity. Two jurors did not remember any pretrial publicity. While six of the jurors had heard some news coverage about the case, each had little knowledge about the facts. Moreover, none of these jurors had formed an opinion about Lynch's guilt. Cf. *State v. Landrum,* 53 Ohio St.3d at 117, 559 N.E.2d 710 (despite exposure to pretrial publicity, "none [of the jurors] indicated they would have trouble putting it out of their mind or having that interfere with their fair and impartial deliberation").

{¶ 37} Following voir dire examination, the defense did not challenge any juror for cause due to pretrial publicity. Moreover, Lynch did not exhaust the full number of defense peremptory challenges to the prospective jurors. The absence of defense challenges for pretrial publicity and the failure to exhaust defense peremptory challenges indicate that the defense was not particularly troubled by the jury's exposure to pretrial publicity once voir dire was completed. See *State v. Davis* (1996), 76 Ohio St.3d 107, 111, 666 N.E.2d 1099.

{¶ 38} We conclude that the trial court did not abuse its discretion in denying the defense motion for a change of venue and overrule proposition XX.

{¶ 39} *Voluntariness.* In proposition of law IV, Lynch argues that his statements and confessions to police were involuntary. Lynch asserts that the police elicited two statements before advising him of his *Miranda* warnings, that his low IQ and inexperience in dealing with the police contributed to the coercive nature of police questioning, that he was worn down by lengthy interrogations, and that the police used deception in getting him to the police station for questioning.

{¶ 40} **Interviews on June 26 and June 27.** Lynch argues that the police improperly questioned him on June 26 and 27 by failing to advise him of his *Miranda* rights. We reject this claim.

{¶ 41} On June 26, 1998, Special Agent Heinlein interviewed Lynch in the hallway outside his apartment as part of a neighborhood canvass. Lynch was not a suspect, he was not arrested, and he was not advised of his *Miranda* rights. Lynch was sweating profusely as he described to Heinlein his last encounter with Love, and Lynch provided information to police that conflicted with information obtained from another neighbor.

{¶ 42} On June 27, Detective Corbett contacted Lynch at his apartment to discuss the discrepancies in his statement. Lynch was not arrested. Rather, Lynch was asked whether he "would mind" going to the police station to talk, and he said that "he would be happy to do so, and he drove his van up to [the] district."

{¶ 43} Lynch was not advised of his *Miranda* rights when his interview began at the police station. Lynch was very talkative, provided detailed information about his activities on June 24, and prepared a written timeline of his whereabouts on that date. During a break in the interview, investigators learned that Lynch had a prior conviction for contributing to the delinquency of a minor for exposing himself to two young girls.

{¶ 44} Police advised Lynch of his *Miranda* rights before resuming his interview. Lynch also reviewed a written copy of his *Miranda* rights after telling police that he could "read well." Lynch waived his rights at 6:44 p.m. and signed the waiver form.

{¶ 45} While Lynch's interview was underway, police administered a computerized voice-stress test around 11:00 p.m.[1] During this test, Lynch stated that he was not involved in Love's disappearance, did not know her whereabouts, did not hurt her, and did not sexually molest her. Test results showed deception. When the police confronted Lynch with those findings, Lynch admitted lying to the FBI. Lynch admitted that he had talked with Love on the steps inside his

---

1. Testimony about voice-stress testing was not presented to the jury.

apartment building on June 23 and that he had lifted her up and had gotten an erection.

{¶ 46}  The police did not arrest Lynch, and he left the police station around 5:00 a.m. after spending approximately 15 hours there.  As Lynch left the police station to return home, he shook hands with Sgt. Thomas Boeing and said he "wanted to thank [the police] very much, and if there was anything else that he could do for us in the future, to feel free to give him a call."

{¶ 47}  Police are not required to administer *Miranda* warnings to everyone they question.  *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714.  "Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."  Id. Only *custodial* interrogation triggers the need for *Miranda* warnings.  Id., 429 U.S. at 494, 97 S.Ct. 711, 50 L.Ed.2d 714.  The determination of whether a suspect was in custody at a particular time requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation."  *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.  "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275, quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711, 50 L.Ed.2d 714.

{¶ 48}  Lynch's initial questioning on June 26 occurred at his apartment before he was suspected of any involvement in Love's disappearance.  Clearly, there was no custodial interrogation, and *Miranda* warnings were unnecessary.

{¶ 49}  On June 27, Lynch voluntarily drove his own vehicle to the police station to be interviewed.  He was not under arrest and was free to leave at any time.  Exercising caution, the police advised Lynch of his *Miranda* rights after learning of his earlier conviction.  However, the police were not required to advise Lynch of his *Miranda* rights because he was not undergoing custodial interrogation.  See *State v. Biros* (1997), 78 Ohio St.3d 426, 441, 678 N.E.2d 891 (no custodial interrogation where accused voluntarily went to the police station in his own vehicle, was not arrested, and was free to leave at any time).

{¶ 50}  **Interview on July 3**. Lynch claims that his confession to police on July 3 was involuntary.  We also reject this claim.

{¶ 51}  Around 12:00 p.m. on July 3, police called Lynch at his place of employment and asked whether he "would mind bringing his van" to police headquarters so that they could take some tire impressions.  In fact, the police were not interested in checking the van's tires and admitted using deception to get Lynch to police headquarters.  Lynch drove his van to police headquarters as

requested, and he agreed to talk to police upon arriving at the station. Again, Lynch was not arrested and was free to leave.

{¶ 52} Police advised Lynch of his *Miranda* rights before beginning the interview. Lynch also read a copy of his *Miranda* rights and then signed a waiver form. During the course of this interview, at around 7:15 p.m., Lynch told police, "She's on Breezy Acres."

{¶ 53} Lynch took police to Love's body and then returned to the police station and gave a taped confession. At the beginning of this confession, an officer said to Lynch, "[E]arlier today, prior to ahh, this tape being taken ahh, you were advised of your rights, is that correct?" Lynch answered, "Yes I was." The officer then asked, "Okay and you understood your rights at the time?" Lynch said, "Yes I did." The tape was transcribed, and Lynch read and signed the transcript at 12:16 a.m. on July 4, after spending 11 and one-half hours with the police.

{¶ 54} "A court, in determining whether a pretrial statement is involuntary, 'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Mason* (1998), 82 Ohio St.3d 144, 154, 694 N.E.2d 932, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus.

{¶ 55} First, Lynch argues that his statements were involuntary because of his low IQ and his inexperience in dealing with the police. Deficient intelligence is but one factor in the "totality of circumstances" to be considered in determining the voluntariness of a confession. While a defendant's mental condition is a significant factor in the voluntariness calculus, it "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473. See, also, Annotation, Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession (1981), 8 A.L.R.4th 16.

{¶ 56} Although Lynch's low IQ was not raised at the suppression hearing, the record shows that his IQ was 72. However, Lynch does not suffer from a major mental disorder such as schizophrenia or bipolar disorder. See *State v. Bays* (1999), 87 Ohio St.3d 15, 23, 716 N.E.2d 1126 (voluntary confession from accused with an IQ of 74); and *State v. Dailey* (1990), 53 Ohio St.3d 88, 91–92, 559 N.E.2d 459 (voluntary confession from an 18–year–old accused with an IQ of 71). Lynch was also able to maintain employment for 19 years prior to Love's murder. Moreover, there was no evidence that Lynch was under the influence of any substance during the interrogation.

{¶ 57} Lynch's behavior during the investigation also belies his claim that his confession was involuntary. On both June 27 and July 3, Lynch voluntarily drove himself to the police station to answer questions. Lynch told police that he "read well," and he read a copy of the *Miranda* waiver form before waiving his rights. Finally, Lynch's written timeline and his taped confession demonstrate his ability to express his thoughts and recall his actions in a rational manner.

{¶ 58} Lynch's claim that his confession was involuntary because he was worn down by lengthy interrogations can also be dismissed. Lynch's interrogation that began on June 27 lasted around 15 hours. However, police did not obtain a confession on June 27; Lynch drove home after the interrogation was over, and several days elapsed before he was questioned again. Thus, the length of Lynch's interrogation on June 27 had no impact on the voluntariness of his confession on July 3.

{¶ 59} On July 3, Lynch's interrogation lasted about five hours before he confessed. Police stopped their interrogation while Lynch showed police the location of Love's body. After returning to the police station, Lynch gave a taped confession, and he signed the transcript of those tapes four hours later.

{¶ 60} Lynch was not under arrest on July 3 until he confessed, and he was free to leave at any time before that. On July 3, Lynch never refused to answer questions, never asked for the questioning to stop, and never asked for medical attention or a lawyer. Lynch was also offered food, soft drinks, and the use of a restroom. Moreover, the police made no threats or promises to Lynch to gain his cooperation. Thus, the evidence supports the conclusion that Lynch's confession was voluntary. See *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738 N.E.2d 1208 (pretrial statement resulting from a 12-hour interview deemed voluntary); see, also, *State v. Brewer* (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491.

{¶ 61} Finally, Lynch claims that his confession was involuntary because the police used deception in getting him to the police station on July 3. Deception is a factor bearing on voluntariness. *Schmidt v. Hewitt* (C.A.3, 1978), 573 F.2d 794, 801. "However, this factor, standing alone, is not dispositive of the issue." *State v. Wiles* (1991), 59 Ohio St.3d 71, 81, 571 N.E.2d 97. Here, police used deception to get Lynch to the police station, but deception was not used during the interview. Thus, police deception did not render Lynch's confession involuntary.

{¶ 62} Under the totality of the circumstances, we find that Lynch's confession was voluntary. We reject proposition IV.

{¶ 63} ***Consent to search.*** In proposition of law V, Lynch argues that he did not voluntarily consent to the search of his apartment and van and that evidence seized during those searches was improperly admitted at trial.

{¶ 64} On June 27, police obtained Lynch's consent to search his apartment and his van while questioning him at the police station. Lynch was not under arrest when this request was made. Police read the consent-to-search forms to Lynch and asked him to "please read [the forms] over." Lynch replied that "he had no problem with it, and he signed both of these documents at the bottom."

{¶ 65} On July 3, police again obtained Lynch's consent to search his apartment while questioning him. Lynch agreed and signed a written consent form.

{¶ 66} Police searched Lynch's apartment on July 4 and seized numerous items of evidence. At trial, an inventory sheet listing the property seized during the search and various photographs taken inside Lynch's apartment were admitted into evidence.

{¶ 67} In order to validly waive his Fourth Amendment rights against unreasonable searches and seizures, Lynch must have voluntarily consented to the searches. Voluntariness of consent is determined under a totality-of-the-circumstances standard. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248–249, 93 S.Ct. 2041, 36 L.Ed.2d 854; *State v. Childress* (1983), 4 Ohio St.3d 217, 4 OBR 534, 448 N.E.2d 155, paragraph one of the syllabus; *State v. Barnes* (1986), 25 Ohio St.3d 203, 208–209, 25 OBR 266, 495 N.E.2d 922.

{¶ 68} Lynch argues that the police coercion that led to his confession also tainted his consents to search. However, as discussed in proposition IV, the police did not use coercion to obtain his confession. Similarly, the police made no promises or threats to obtain Lynch's consent to search his van and apartment. Also, there is no evidence that Lynch was under the influence of drugs or alcohol when he gave his consent.

{¶ 69} Moreover, Lynch's low intelligence and lack of education do not negate the voluntariness of his consent to search. Low intelligence is a factor in determining whether consent was voluntary, but it is not necessarily the decisive factor. Cf. *United States v. Mendenhall* (1980), 446 U.S. 544, 558, 100 S.Ct. 1870, 64 L.Ed.2d 497. See, also Annotation, When is Consent Voluntarily Given so as to Justify Search Conducted on Basis of that Consent—Supreme Court Cases (1998), 148 A.L.R.Fed. 271, 284.

{¶ 70} Lynch appeared to the police to "understand what [they] were asking him to do when [they] read over that consent to search." Lynch also told investigators that he "read well, he just didn't write very well," before reading over the consent-to-search forms himself and signing them. Despite evidence of Lynch's low intelligence, we find that Lynch voluntarily consented to the searches. We overrule proposition V.

*Trial issues*

{¶ 71}  *Other acts evidence.*  In proposition of law VI, Lynch complains that the trial court erred by admitting into evidence a photograph depicting the stuffed children's toys found in his apartment.  Lynch argues that the prosecution presented this picture as evidence of wrongdoing that should not have been admitted.

{¶ 72}  The police searched Lynch's apartment and seized about a dozen stuffed animals from his bedroom closet.  A photograph of these stuffed animals was admitted into evidence at trial.

{¶ 73}  However, Lynch's possession of stuffed animals could not reasonably be considered evidence of other crimes, wrongs or bad acts.  See *State v. Wickline* (1990), 50 Ohio St.3d 114, 120, 552 N.E.2d 913.  Moreover, Lynch's possession of the stuffed toys at the time of Love's murder was relevant to the facts of the crime.  See *State v. Hirsch* (1998), 129 Ohio App.3d 294, 308, 717 N.E.2d 789.  Lynch admitted that Love was inside his apartment prior to the murder, and the toys helped explain how Lynch may have lured the six-year-old girl into his apartment on the day she was murdered.  We find that the trial court did not abuse its discretion in admitting this evidence.  See *State v. Hartman* (2001), 93 Ohio St.3d 274, 281, 754 N.E.2d 1150 (the admission of relevant evidence is within the sound discretion of the trial court.)

{¶ 74}  Lynch also argues that the prosecutor improperly referred to Lynch's stuffed animals during the state's penalty-phase closing argument.  Here, Lynch objects to the prosecutor's comments that "toys and popcorn, those are the tools of the trade for the child molester, and that's why he has those and that's why he chose to have those items with him.  It was his free choice; no addiction and no compulsion made him do that.  He chose."  However, Lynch failed to object at trial to the argument he now complains about and thus waived all but plain error.  *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 75}  The prosecutor's rebuttal comments responded to earlier defense arguments suggesting that Lynch's behavior as a pedophile was not a matter of choice.  The defense counsel argued that Lynch "has had a lifetime of secrets, shameful urges and compulsions.  Pedophiles are not generally killers.  * * * What happened, his behavior was out of control.  He was fulfilling a fantasy and things went out of control, and I think he's appalled by what he did also.  He panicked."  The defense also argued that "this is not something that anyone would wish for themselves.  It's not so simple with this compulsion to simply turn on the faucet and turn it off.  It does not work that way."

{¶ 76}  Here, the prosecutor simply pointed out that Lynch made choices (i.e., living at an apartment complex populated with children and possessing children's

toys) that led to Love's murder. Thus, the prosecutor's rebuttal argument represented fair comment and was not plain error. See *State v. Murphy* (1992), 65 Ohio St.3d 554, 572, 605 N.E.2d 884. For these reasons, we reject proposition VI.

{¶ 77} *Lesser included offenses.* In proposition of law XIX, Lynch claims that the trial court erred by refusing Lynch's request to instruct the jury on the lesser included offenses of involuntary manslaughter on Count 5 and gross sexual imposition on Count 1.

{¶ 78} The trial court instructed the jury on involuntary manslaughter as a lesser included offense of the two felony murder charges in Counts 2 and 4. However, the trial court refused to instruct on involuntary manslaughter as a lesser included offense of aggravated murder by purposely causing the death of a child under 13 years of age, R.C. 2903.01(C), in Count 5.

{¶ 79} Involuntary manslaughter, R.C. 2903.04, is a lesser included offense of aggravated murder with prior calculation and design, R.C. 2903.01(A), aggravated felony murder, R.C. 2903.01(B), and murder, R.C. 2903.02. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph one of the syllabus; *State v. Rohdes* (1986), 23 Ohio St.3d 225, 227, 23 OBR 382, 492 N.E.2d 430. Thus, involuntary manslaughter is a lesser included offense of other forms of murder besides felony murder. Involuntary manslaughter is a lesser offense of these forms of murder because the only distinguishing factor is the mental state involved in the act. See *State v. Thomas*, 40 Ohio St.3d at 216, 533 N.E.2d 286. The same rationale applies in finding that involuntary manslaughter is a lesser included offense of aggravated murder of a child under 13.

{¶ 80} However, even though involuntary manslaughter is a lesser included offense in Count 5, the trial court did not err by refusing to instruct on involuntary manslaughter. A charge on a "lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus; *State v. Kidder* (1987), 32 Ohio St.3d 279, 513 N.E.2d 311.

{¶ 81} During trial, the defense argued for an involuntary manslaughter instruction on Count 5 because of evidence that Lynch wanted to make Love stop crying but did not purposely kill her. However, under any reasonable view of the evidence, the killing was done with purpose. According to Lynch's confession, his hands were around Love's neck for approximately "three minutes" when he strangled her. Lynch's actions would lead any reasonable trier of fact to conclude that Lynch intended to kill Love when his hands remained around her neck for that length of time. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 347, 703 N.E.2d 1251 (shooting in the head at point-blank range showed that the

victim was killed purposely despite defendant's claim that the "gun just went off"); *State v. Williams* (1996), 74 Ohio St.3d 569, 574, 660 N.E.2d 724 (nature of the victim's injuries did not support a reasonable finding that the victim was not killed purposely).

{¶ 82} Even if the trial court erred by not instructing on the lesser included offense in Count 5, it made no difference. The jury found that Lynch purposely killed Love when it found him guilty of aggravated murder rather than involuntary manslaughter in Counts 2 and 4. Clearly, the jury would have reached a similar finding on Count 5.

{¶ 83} Lynch also claims that the trial court erred by refusing to instruct on the lesser included offense of gross sexual imposition to the rape charge in Count 1. Gross sexual imposition, R.C. 2907.05(A)(4), is a lesser included offense of rape, R.C. 2907.02(A)(1)(b). See *State v. Johnson* (1988), 36 Ohio St.3d 224, 522 N.E.2d 1082, paragraph one of the syllabus. However, an instruction on a lesser included offense should be given only when the evidence warrants it. *State v. Thomas,* 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus.

{¶ 84} "Sexual conduct" with another is an element of rape, whereas only "sexual contact" is required to prove gross sexual imposition. R.C. 2907.02 and 2907.05. R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶ 85} The defense claimed at trial that Lynch was entitled to an instruction on gross sexual imposition because he kissed and touched Love's genitals but did not penetrate. However, the evidence shows that there was penetration. According to Detective Goebel, Lynch admitted that his tongue went inside Love's vagina "a little."

{¶ 86} Even assuming that the jury might reasonably conclude that there was no penetration, Lynch was not entitled to an instruction on the lesser included offense of gross sexual imposition. Penetration is not required to commit cunnilingus. Rather, the act of cunnilingus is completed by the placing of one's mouth on the female's genitals. See *State v. Ramirez* (1994), 98 Ohio App.3d 388, 393, 648 N.E.2d 845; *State v. Bailey* (1992), 78 Ohio App.3d 394, 395, 604 N.E.2d 1366. Based on the foregoing, we find that the lesser included offense of gross

sexual imposition was not reasonably supported by the evidence, and the trial court did not err by refusing to give this instruction. We reject proposition XIX.

{¶ 87} *Reasonable doubt.* In proposition of law XVII, Lynch challenges the trial court's use of the definition of "reasonable doubt" in R.C. 2901.05(D) when instructing the jury at both phases of the trial. However, we have repeatedly affirmed the constitutionality of R.C. 2901.05. See *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163; *State v. Hessler* (2000), 90 Ohio St.3d 108, 115, 734 N.E.2d 1237; *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 694 N.E.2d 916. Thus we reject proposition XVII.

{¶ 88} *Sufficiency of the evidence.* In proposition of law XV, Lynch argues that the state failed to prove that he intentionally killed Love. He also claims that the state failed to prove aggravated murder to avoid detection in Specification 1 of Counts 2, 4, and 5.

{¶ 89} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 90} As we held in *State v. Garner* (1995), 74 Ohio St.3d 49, 60, 656 N.E.2d 623, "The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective proof. The law recognizes that intent can be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts."

{¶ 91} The nature and duration of Lynch's acts established his intent to kill. Lynch lured Love into his apartment, undressed her, and then orally raped her. Lynch put his hands around her neck after she started to cry and strangled her for three minutes.

{¶ 92} The jury clearly rejected Lynch's claim that he was only trying to quiet Love and did not intend to kill her. The evidence and surrounding circumstances strongly support the jury's verdict that Lynch intended to kill Love. Cf. *State v. Eley* (1996), 77 Ohio St.3d 174, 180, 672 N.E.2d 640 (firing a loaded gun at victim established intent to kill despite defendant's claim that he was only trying to hit the victim in the shoulder).

{¶ 93} Lynch argues that evidence supporting his conviction for aggravated murder to escape detection is purely circumstantial and consists almost entirely of proof that he hid Love's body after killing her. We also reject this argument.

{¶ 94} The jury could infer from the timing of the murder that Lynch strangled Love so that neighbors would not hear her screams and call the police. The jury could also reasonably conclude that Lynch killed Love to eliminate the only witness against him. See *State v. Wiles* (1991), 59 Ohio St.3d 71, 85, 571 N.E.2d 97 (where defendant killed the only witness against him, the jury could conclude that the defendant murdered the victim to escape detection). Moreover, evidence that Lynch dumped Love's body in a remote wooded area and disposed of her clothing in dumpsters provided additional evidence that he had killed her to escape detection. Thus, there was sufficient evidence for the jury to reasonably conclude that Lynch murdered Love for the purpose of escaping detection.

{¶ 95} Finally, we reject Lynch's claim that constitutional, statutory, and evidentiary errors, prosecutorial misconduct, and ineffective assistance of counsel permeated his trial.

{¶ 96} Based on the foregoing, we find that the evidence is sufficient to establish Lynch's guilt for the crimes for which he was convicted. Accordingly, we overrule proposition XV.

### Penalty–phase issues

{¶ 97} *Unsworn statement.* In proposition of law XIV, Lynch argues that the trial court erred by refusing his counsel's request to use a question-and-answer format in presenting Lynch's unsworn statement.

{¶ 98} The defense requested a question-and-answer format because of Lynch's "difficulty focusing on an issue for even a brief period of time." In support of this motion, Dr. Robert Tureen, a clinical psychologist, stated that Lynch has an IQ of 72. According to Tureen, Lynch has "considerable difficulty * * * [attending] to auditory information in a consistent and efficient manner" and has "difficulty with attentional focusing." Further, an increase in Lynch's anxiety level at trial could be expected to "intensify [his] attentional problems." The trial court, however, denied the defense's request.

{¶ 99} R.C. 2929.03(D)(1) permits a capital defendant to make an unsworn statement during the penalty phase of the trial. R.C. 2929.03(D)(1) provides, "If the offender chooses to make a *statement,* the offender is subject to cross-examination only if the offender consents to make the statement under oath or affirmation." (Emphasis added.)

{¶ 100} First, Lynch claims that the trial court violated his constitutional rights by refusing his request to make an unsworn statement using a question-and-answer format. However, the underlying premise of Lynch's constitutional

claim is faulty. The Supreme Court of the United States has never squarely held that a court's refusal to allow a defendant to allocute is a constitutional violation. However, two federal circuit courts recently concluded that a capital defendant does not have a constitutional right to make an unsworn statement to a jury during the penalty phase of the trial. See *United States v. Hall* (C.A.5, 1998), 152 F.3d 381, 396, abrogated in part on other grounds; *United States v. Barnette* (C.A.4, 2000), 211 F.3d 803, 820. Several state courts have reached the same conclusion. See *State v. Stephenson* (Tenn.1994), 878 S.W.2d 530, 551; *People v. Robbins* (1988), 45 Cal.3d 867, 889, 248 Cal.Rptr. 172, 755 P.2d 355; *People v. Brown* (1996), 172 Ill.2d 1, 61, 216 Ill.Dec. 733, 665 N.E.2d 1290; *State v. Green* (1994), 336 N.C. 142, 191, 443 S.E.2d 14; and *Duckett v. State* (Okla.Crim.App. 1995), 919 P.2d 7, 22.

{¶ 101} Other jurisdictions have concluded that the common-law right of allocution permits a capital defendant to make an unsworn statement before a jury. *Harris v. State* (1986), 306 Md. 344, 359, 509 A.2d 120; *Homick v. State* (1992), 108 Nev. 127, 133, 825 P.2d 600. In some states, a capital defendant's right to make an unsworn statement before the jury is explicitly permitted by statute or rule. *People v. Borrego* (Colo.1989), 774 P.2d 854, 856; *Shelton v. State* (Del.1999), 744 A.2d 465, 495.

{¶ 102} Several jurisdictions limit the scope and content of a capital defendant's right to present an unsworn statement before the jury. See *State v. Zola* (1988), 112 N.J. 384, 430, 548 A.2d 1022 (defendant "would not be permitted to rebut any facts in evidence, to deny his guilt, or indeed, to voice an expression of remorse that contradicts evidentiary facts"); *State v. Rogers* (2000), 330 Ore. 282, 304, 4 P.3d 1261 (requiring defendant "to read from a prepared statement and to submit that statement in advance for the court's review" does not violate the defendant's rights). See, also, *State v. Lord* (1991), 117 Wash.2d 829, 898, 822 P.2d 177.

{¶ 103} In sum, Ohio and several other states permit defendants to present an unsworn statement to the jury during the penalty phase of a capital trial. However, the majority view does not support a holding that a defendant has a constitutional right even to make an unsworn statement, let alone an unsworn statement in a question-and-answer format. We find that the trial court did not violate Lynch's constitutional rights by denying his request.

{¶ 104} Second, Lynch claims that the trial court abused its discretion by not permitting him to present his unsworn statement in a question-and-answer format.

{¶ 105} A capital defendant has "great latitude in a sentencing hearing under R.C. 2929.04(C), and technical rules of evidence cannot be used to exclude otherwise proper mitigating evidence." *State v. Grant* (1993), 67 Ohio St.3d 465,

479, 620 N.E.2d 50; see, also, *Green v. Georgia* (1979), 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738. However, a trial court does not abuse its discretion unless it acts arbitrarily, unreasonably, or unconscionably. See *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 106} We find that the trial court did not abuse its discretion in denying the defense's request. Here, the trial court acted within its discretion by following the R.C. 2929.03(D)(1) language and limiting the defendant's presentation to a statement. Lynch coherently presented his comments and thoughts during his police confession, and the trial court might reasonably conclude that Lynch could do so in his unsworn statement.

{¶ 107} Moreover, Lynch has failed to show that he suffered prejudice. As a general rule, "[a] party may not predicate error on the exclusion of evidence during the examination in chief unless *two* conditions are met: (1) the exclusion of such evidence must affect a substantial right of the party *and* (2) the substance of the excluded evidence was made known to the court by proffer *or* was apparent from the context within which the questions were asked." (Emphasis sic.) *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147, syllabus; see, also, *State v. Grubb* (1986), 28 Ohio St.3d 199, 203, 28 OBR 285, 503 N.E.2d 142.

{¶ 108} Here, the defense counsel failed to make any proffer showing the additional information he would have presented in an unsworn statement using a question-and-answer format. Thus, we do not know what additional information Lynch might have presented.

{¶ 109} Moreover, the lack of prejudice is supported by the fact that Lynch presented a coherent unsworn statement to the jury. He said: "As you know, I killed—I killed Mary Jennifer Love. I didn't mean to kill her, but I killed her. I did it and I don't know why I did it. I don't know what happened. I'm sorry it happened, and I'm sorry for the folks that I hurt. I know I hurt her mother, I hurt the father, I hurt the brothers and sisters, and I took that love away from them. And I don't know why. I didn't mean to hurt anybody. But, I tried to stop, you know, doing these things and I didn't succeed. But I am sorry that this all happened, and I'm just so sorry about it. *That's all I got to say.*" (Emphasis added.) Lynch also presented several family members and expert witnesses who testified about his abusive upbringing, his low intelligence, and his pedophilia. Thus, there is no basis for concluding that Lynch was prejudiced by the trial court's ruling.

{¶ 110} However, the trial court would have acted within its discretion by allowing the defendant to use a question-and-answer format in making an unsworn statement. A defendant's unsworn statement is often a critical part of defense mitigation. See *State v. Mapes* (1985), 19 Ohio St.3d 108, 120, 19 OBR 318, 484 N.E.2d 140, fn. 9. In many capital proceedings, counsel's assistance can

be very helpful in directing a defendant's focus in making an unsworn statement. This is particularly true when a defendant's low intelligence or other mental deficiencies hinder his ability to present an unsworn statement. Thus, we hold that a trial court may, in its discretion, permit a capital defendant to make an unsworn statement under R.C. 2929.03(D)(1) using a question-and-answer format.

{¶ 111} In the case sub judice, the trial court did not abuse its discretion by denying the defense's request. Hence, we reject proposition XIV.

{¶ 112} *Exclusion of mitigation.* In proposition of law XIII, Lynch argues that the trial court violated his due process rights by refusing to provide the jury with information about potential sentences for his noncapital offenses.

{¶ 113} The trial court refused the defense request to present the jury with information about Lynch's possible sentence for rape, kidnapping, and gross sexual imposition. However, the trial court permitted the defense to note in closing argument that Lynch faced additional jail time "[a]s long as you don't mention what the possible sentence would be."

{¶ 114} First, Lynch argues that information about sentencing for Lynch's noncapital offenses was relevant mitigation that he was entitled to present to the jury. "In Eighth Amendment jurisprudence, mitigating factors are facts about the defendant's character, background, or record, or the circumstances of the offense, that may call for a penalty less than death." *State v. White* (1999), 85 Ohio St.3d 433, 448, 709 N.E.2d 140; see, also, *Franklin v. Lynaugh* (1988), 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (plurality opinion). However, "the length of incarceration to be served by the defendant before parole eligibility is not a fact about the defendant's character or background, or about the circumstances of the offense." *State v. White*, 85 Ohio St.3d at 448, 709 N.E.2d 140; *O'Dell v. Netherland* (1997), 521 U.S. 151, 162–168, 117 S.Ct. 1969, 138 L.Ed.2d 351. Thus, information about sentencing for noncapital offenses is not a mitigating factor.

{¶ 115} Second, Lynch argues that *Simmons v. South Carolina* (1994), 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133, permitted the defense to provide the jury with complete information about his sentencing for noncapital offenses, since it showed that he would never be released from jail. *Simmons* holds that in a capital case, "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, *due process* requires that the sentencing jury be informed that the defendant is parole ineligible." (Emphasis added.) Id. at 156, 114 S.Ct. 2187, 129 L.Ed.2d 133 (plurality opinion). In *Simmons*, life imprisonment without parole was the sole alternative to death—a point stressed by the concurring judges who cast the deciding votes in that case. Id. at 176–177, 114 S.Ct. 2187, 129 L.Ed.2d 133 (O'Connor, J., concurring); *State v. White*, 85 Ohio St.3d. at 449, 709 N.E.2d 140.

{¶ 116} In the case sub judice, the jury had the choice of sentencing Lynch to death, life without parole, life with parole eligibility after 30 years, or life with parole eligibility after 25 years. Thus, unlike in *Simmons,* the jury in this case was not faced with the notion that the only way to keep Lynch from getting out of prison was to sentence him to death.

{¶ 117} During the penalty-phase closing argument, the defense pointed out that Lynch was assured of spending the rest of his life in jail because he faced additional jail time for his noncapital offenses. The defense argued:

{¶ 118} "Do you want Mr. Lynch on the street again or where there could be a victim of sexual abuse? No. This man will be 50 years old next month. What I would suggest is that * * * if you gave him, for example, 25 years, full sentence, he would be 75 years old. And that doesn't take into consideration the issue of punishment as it relates to the others, the aggravating circumstances. The rape, the kidnapping, the gross abuse of a corpse, I can't talk about those, and that's for His Honor to do at a different time. So, at the very least, you would be talking about 25 full years, plus in addition to whatever His Honor would give. And if you go beyond that, you can guarantee that there is life without parole, and that's punishment. And let nobody suggest to you that being in prison for the balance of your life is not punishment."

{¶ 119} Thus, the defense assured the jury that "future dangerousness" was not an issue because Lynch would spend the rest of his life in jail after he was sentenced for both the capital and noncapital offenses. In view of the defense argument and the trial court's instructions on sentencing options, we do not believe that the jury recommended the death penalty based on the false belief that Lynch might otherwise be released on parole some day. Thus, we find that the record does not support Lynch's due process claim. Accordingly, we reject proposition XIII.

{¶ 120} *Nonstatutory aggravating factors.* In proposition of law III, Lynch asserts that the nature and circumstances of the offense were improperly considered as aggravating factors.

{¶ 121} First, Lynch argues that the following comments in the prosecutor's penalty-phase closing argument were improper: "And when you think of the aggravated murder, the purposeful killing of this child, the only caress she received was from him, for his pleasure, and the only grasp she received was not one of comfort, but as those big hands closed around her neck. And when Mary Love passed, unlike children that die of natural death, she wasn't thanking [sic] God to spare her life; she was probably begging him to take it. And that is the final aggravating circumstance. And when you put that on the other side of the ledger, ladies and gentlemen, that's what you weigh against what he presented to you these last couple days." However, Lynch failed to object to this argument

and waived all but plain error. See *State v. Wade,* 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 122} The prosecutor erred in inviting the jury to consider what the victim experienced and was feeling in her last moments of life. As recognized in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 357, 662 N.E.2d 311, citing *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, such argument improperly "invites the jury to speculate on facts not in evidence."

{¶ 123} The prosecutor compounded the error by arguing that the jury could consider the victim's anguish as the "final aggravating circumstance." As stated in *State v. Wogenstahl,* 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus, "[i]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.'"

{¶ 124} However, we find that the prosecutor's improper argument did not affect the outcome of the trial in view of the four statutory aggravating circumstances that Lynch was found guilty of committing and the lack of compelling mitigating evidence. Cf. *State v. Wogenstahl,* 75 Ohio St.3d at 360, 662 N.E.2d 311; *State v. Hartman,* 93 Ohio St.3d 274, 294, 754 N.E.2d 1150.

{¶ 125} Moreover, the trial court properly instructed the jury that the only aggravating circumstances in this case were the four aggravating circumstances that Lynch had been found guilty of committing. On this point the instructions were very clear, and we can assume that the jury followed the trial court's instructions. *State v. Wogenstahl,* 75 Ohio St.3d at 360, 662 N.E.2d 311.

{¶ 126} Lynch also argues that the trial court, in its sentencing opinion, improperly considered the nature and circumstances of the offense as aggravating circumstances. See R.C. 2929.03(F).

{¶ 127} In its opinion, the trial court identified "the four separate specifications" in Counts 2, 4, and 5 as the aggravating circumstances. The trial court found that the evidence proved each of these aggravating circumstances beyond a reasonable doubt. The trial court also commented that "the defendant's killing of Mary Jennifer Love, was a cruel act of violence and the result of a perverse sexual orientation by the defendant."

{¶ 128} The trial court's comment that the crime was "a cruel act of violence and the result of a perverse sexual orientation" referred to the rape as an aggravating circumstance. Moreover, the trial court correctly identified the four aggravating circumstances in its sentencing opinion, and this court can presume that the trial court relied on only those circumstances and not on nonstatutory aggravating circumstances. *State v. Clemons* (1998), 82 Ohio St.3d 438, 447, 696 N.E.2d 1009; *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271.

{¶ 129}  Finally, Lynch complains about references in the sentencing opinion to his conviction for gross abuse of a corpse.  In summarizing the crime, the trial court stated that Lynch admitted that he was "the principal, sole offender and that he kidnapped her, raped her and disposed of her body in a gross and abusive way."  The trial court, in discussing the mitigating factors, commented that "tragically * * * [Lynch] committed Rape, Kidnapping, the killing of a child under thirteen and then unceremonious[ly] discarded this helpless child's body in a gross manner."  While the trial court may have made gratuitous comments about disposal of the body, the trial court's opinion shows that it properly identified the four aggravating circumstances and understood the difference between the aggravating circumstances and the nature and circumstances of the offense.

{¶ 130}  Any misstatements in the sentencing opinion were harmless.  The trial court properly weighed the aggravating circumstances against the mitigating factors.  Moreover, we have independently reevaluated the sentence and thereby rectified any error in the sentencing opinion.  *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124; *State v. Lott,* 51 Ohio St.3d 160, 170, 555 N.E.2d 293.  We overrule proposition III.

{¶ 131}  *Merger.*  In proposition of law X, Lynch contends that since there was only one victim in this case, the court's submission to the jury of more than one aggravated murder count tainted the jury's sentencing recommendation.

{¶ 132}  Aggravated murder counts involving the same victim are to be merged for sentencing.  *State v. Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N.E.2d 902.  However, the court's failure to merge the three counts prior to submitting the case to the jury for sentencing "represents a 'procedural' error that is 'harmless beyond a reasonable doubt.'"  *State v. O'Neal* (2000), 87 Ohio St.3d 402, 415, 721 N.E.2d 73, quoting *State v. Moore* (1998), 81 Ohio St.3d 22, 39, 689 N.E.2d 1; see, also, *State v. Twyford* (2002), 94 Ohio St.3d 340, 351, 763 N.E.2d 122.  In any event, the trial court merged the three murder counts prior to imposing the death sentence.  Thus, proposition X lacks merit.

{¶ 133}  In proposition of law XXI, Lynch argues that the trial court erred by refusing to merge the counts of rape and kidnapping into a single count and the underlying capital specifications of rape and kidnapping into a single specification.  Lynch contends that in view of *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, the two offenses must be merged because they "describ[e] a single offense, with a single animus."

{¶ 134}  The test to determine whether kidnapping was committed with a separate animus is "whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense."  *State v. Logan,* 60 Ohio St.2d at 135, 14

O.O.3d 373, 397 N.E.2d 1345. In *Logan* and subsequent cases, prolonged restraint, secretive confinement, and substantial movement apart from that involved in the other crime were factors necessary to establish a "separate animus as to each offense sufficient to support separate convictions." Id. at subparagraph (a) of the syllabus; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 198, 15 OBR 311, 473 N.E.2d 264.

{¶ 135}  Here, the facts show substantial movement as Lynch lured Love into his apartment and then moved her into his bedroom; Love's restraint was secretive, as it took place inside Lynch's apartment; and there was prolonged restraint, as Love ate popcorn and watched videos inside the apartment before being orally raped.  These facts show that Lynch committed the kidnapping offense with an animus separate from the rape.  See *State v. Rogers* (1985), 17 Ohio St.3d 174, 181–182, 17 OBR 414, 478 N.E.2d 984, vacated and remanded on different grounds in (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452 (the rape and kidnapping of a seven-year-old victim inside the defendant's apartment were separate offenses); *State v. Reynolds* (1998), 80 Ohio St.3d 670, 682, 687 N.E.2d 1358.

{¶ 136}  Thus, the trial court properly ruled that the rape and kidnapping specifications along with the counts for rape and kidnapping could be considered separately for sentencing purposes.  We overrule proposition XXI.

{¶ 137}  In proposition of law XI, Lynch argues that the trial court erred by failing to merge duplicative death-penalty specifications before they were presented to the jury during the penalty phase.  However, except for the kidnapping and rape specifications, R.C. 2929.04(A)(7), the defense failed to request merger of the specifications and thus waived all but plain error.  *State v. Cook* (1992), 65 Ohio St.3d 516, 528, 605 N.E.2d 70.

{¶ 138}  Here, there were four death-penalty specifications: murder to escape detection, apprehension, trial, or punishment for another offense, R.C. 2929.04(A)(3); felony murder predicated on rape, R.C. 2929.04(A)(7); felony murder predicated on kidnapping, R.C. 2929.04(A)(7); and murder of a child under 13, R.C. 2929.04(A)(9).

{¶ 139}  However, the two R.C. 2929.04(A)(7) specifications were not duplicative.  As discussed in proposition XXI, the facts show that Lynch committed the rape and kidnapping specifications with a separate animus.

{¶ 140}  The R.C. 2929.04(A)(3) and (A)(7) specifications were not duplicative, since they did not arise from the same act or indivisible course of conduct.  Lynch lured Love into his apartment, and after they watched TV and ate popcorn, he removed Love's clothing and orally raped her.  When Love started screaming, Lynch strangled her to keep her quiet.  The facts establish that kidnapping and rape were crimes distinct from murder to escape detection.

Therefore, merger of the R.C. 2929.04(A)(3) and (A)(7) specifications was unnecessary. *State v. Wogenstahl,* 75 Ohio St.3d 344, 367, 662 N.E.2d 311.

{¶ 141} Finally, the R.C. 2929.04(A)(9) specification represents a separate death specification from both the R.C. 2929.04(A)(3) and (A)(7) specifications. The fact that the victim was a child under 13 years of age is not implicit in felony murder or murder to escape detection. Thus, the specifications did not arise from the same act or indivisible course of conduct. *State v. Robb* (2000), 88 Ohio St.3d 59, 85, 723 N.E.2d 1019 (inmate status treated as separate from felony murder and course of conduct). Proposition XI lacks merit.

{¶ 142} *Consecutive sentences.* Proposition of law XVI asserts that the trial court was without authority to impose punishment to be served consecutively to his death sentence. We rejected this argument in *State v. Moore,* 81 Ohio St.3d at 38, 689 N.E.2d 1; *State v. Bies* (1996), 74 Ohio St.3d 320, 325, 658 N.E.2d 754; and *State v. Campbell* (1994), 69 Ohio St.3d 38, 52, 630 N.E.2d 339. As noted in these cases, the prison sentence is rendered moot by the execution of the death sentence. Thus, proposition XVI is rejected.

{¶ 143} *Proportionality.* In proposition of law IX, Lynch argues that the death penalty is disproportionate when his case is compared to similar death-penalty cases. Lynch's argument will be addressed during the independent sentence evaluation.

### Prosecutorial Misconduct

{¶ 144} In proposition of law II, Lynch complains that the prosecutor committed misconduct by appealing to the passions and prejudices of the jury.

{¶ 145} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 146} Lynch argues that the prosecutor committed misconduct by eliciting a description of the victim's personality from her mother. During the prosecution's case-in-chief, Carol Williams, the victim's mother, described her daughter as "a very sweet little girl, very friendly, open heart to everybody * * * [and] sometimes too nice." Williams also testified that her daughter was a very trusting little girl and said, "I don't think Mary considered anybody a stranger."

{¶ 147} Williams's brief testimony about her daughter's friendly and trusting nature was highly relevant. Evid.R. 401. Such evidence showed that Lynch could have easily lured Love into his apartment. Here, testimony about the victim's personality was not introduced to elicit the jury's sympathy. Instead, it

focused on events leading to Love's kidnapping, rape, and murder. There was no prosecutorial misconduct in introducing such evidence. Cf. *State v. Broom* (1988), 40 Ohio St.3d 277, 289, 533 N.E.2d 682; *State v. Williams* (1988), 38 Ohio St.3d 346, 354, 528 N.E.2d 910.

{¶ 148} Lynch also claims that the prosecutor committed misconduct during the penalty-phase closing argument by (1) alluding to the emotions of the victim, (2) arguing that the brutality of the victim's death was an aggravating circumstance, and (3) referring to stuffed animals found in Lynch's apartment as "tools of the trade for the child molester." However, Lynch failed to object and waived all but plain error. See *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. As earlier discussed in propositions of law III and VI, the prosecutor's comments did not result in plain error. For the foregoing reasons, we reject proposition II.

### Ineffective assistance of counsel

{¶ 149} In proposition of law I, Lynch argues that he received ineffective assistance of counsel. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense "so serious as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 150} Lynch complains that his counsel were ineffective by failing to object to a defense witness's damaging testimony that Lynch had molested other children. The defense deposed Elizabeth Iverson, Lynch's cousin, and presented her videotaped deposition during the penalty phase. During cross-examination, Iverson mentioned that she had heard rumors that Lynch molested "his cousin * * * in Cincinnati." During further cross-examination, Iverson alluded to rumors that Lynch had molested Melissa, a young girl from Oregon.

{¶ 151} However, the defense purposefully introduced background information during mitigation about Lynch's pedophilia. Dr. Tureen's report mentions that Lynch abused other children through "sexual contact with younger cousins. Then in 1989, he had sexual contact (exhibiting) with two young girls." During the penalty-phase closing argument, the defense emphasized that Lynch "never physically hurt" any of his earlier molestation victims. The defense then provided an explanation for Lynch's actions by stating that he was "fulfilling a fantasy and things went way out of control * * *. He panicked."

{¶ 152} The defense strategy was to portray Lynch as a lifelong pedophile who never harmed any victim until he murdered Love. Moreover, from a defense standpoint, evidence that Lynch did not physically harm his earlier victims

showed the jury that Lynch was not a cold-blooded killer. This was a legitimate defense approach in trying to convince the jury that Lynch should receive a life sentence rather than the death penalty. "Given * * * the 'strong presumption' that counsel's performance constituted reasonable assistance, counsel's actions must be viewed as tactical decisions and do not rise to the level of ineffective assistance." *State v. Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶ 153} Finally, Lynch fails to show that there is a "reasonable probability" that but for counsel's actions the result of his case would have been different. Thus, counsel's failure to object to Iverson's testimony did not constitute ineffective assistance, and proposition I is overruled.

### Constitutional issues

{¶ 154} In propositions of law VII and VIII, Lynch argues that his death sentence was imposed in violation of the United States and Ohio Constitutions. We have previously rejected similar arguments, and we summarily overrule them here. See *State v. Clemons,* 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125–126, 31 OBR 273, 509 N.E.2d 383; *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraphs one and two of the syllabus.

{¶ 155} In proposition of law XII, Lynch challenges the constitutionality of excluding prospective jurors opposed to the death penalty. This claim is without merit. See id. at paragraph two of the syllabus; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph two of the syllabus.

{¶ 156} In proposition of law XVIII, Lynch challenges the constitutionality of our proportionality review. This claim has also been resolved. See *State v. Steffen,* 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *State v. Smith* (1997), 80 Ohio St.3d 89, 118, 684 N.E.2d 668.

### Cumulative error

{¶ 157} In proposition of law XXII, Lynch contends that individual and collective errors, whether raised by appellate counsel or not, mandate reversal of his conviction and death sentence. However, we find that Lynch received a fair trial and fair sentencing determination and that no significant cumulative error occurred. Therefore, we reject proposition XXII.

## INDEPENDENT SENTENCE EVALUATION

{¶ 158} *Aggravating circumstances.* The evidence established that Lynch was properly convicted of four death-penalty specifications for aggravated murder, namely, murder to escape detection for committing rape, R.C. 2929.04(A)(3);

murder while committing, attempting to commit, or fleeing after committing rape, R.C. 2929.04(A)(7); murder while committing, attempting to commit, or fleeing after committing kidnapping, R.C. 2929.04(A)(7); and murder of a child under 13 years of age, R.C. 2929.04(A)(9).

{¶ 159} *Mitigating evidence.* Lynch called five mitigation witnesses, made an unsworn statement, and introduced documentary evidence for the jury's consideration.

{¶ 160} Elizabeth Iverson, Lynch's cousin, grew up with Doris Hayes, Lynch's mother, in Cincinnati. Doris attended school through only the third grade and was functionally illiterate.

{¶ 161} Doris met and married Ralph Lynch Sr. while she was working in Indiana. Ralph and Doris's children were Lynch and Darlene. After Lynch's parents divorced, Doris had another child, Debbie, who was sent to live with other family members.

{¶ 162} In June 1953, Doris, Lynch, and Darlene moved to Albuquerque, New Mexico, with Iverson and her two children. Lynch was described as a "quiet child" who did not interact well with other children and "smiled [only] once in a while."

{¶ 163} Doris later moved to Vallejo, California, and Lynch and Darlene were sent to live with their maternal grandparents in Ohio. Doris married Milford Hayes, and they lived together in California.

{¶ 164} Lynch and Darlene later rejoined the family when Doris and Hayes moved to Ohio. The family later moved to Oregon, where Hayes worked at a sawmill. Because of the family's financial problems, Lynch, Darlene, and some of their half-siblings were sent to live with neighbors, Clyde MacWhorter and his friend Don Fletcher. Iverson later learned that the children were molested while living with these men.

{¶ 165} Doris died in 1988. However, Lynch did not attend his mother's funeral because he "had gotten really angry with his mother and he said he would never go back into the state of Oregon until she had died."

{¶ 166} During cross-examination, Iverson mentioned hearing rumors that Lynch had molested his cousin when they were both children.

{¶ 167} Milford Hayes, Lynch's stepfather, testified that he married Doris in 1956 while living in California. Hayes and Doris had five children together, in addition to Doris's children from prior relationships.

{¶ 168} Hayes and Doris later lived in Ohio for four years and then moved to Sweet Home, Oregon. While living in Oregon, Lynch was sent to live with neighbors, MacWhorter and Fletcher, for about one year. Hayes later learned

that Fletcher had molested Lynch, and state welfare officials placed Lynch in a foster home.

{¶ 169}   Peggy Gomez, Lynch's younger half-sister, testified about the sexual abuse of her brothers and sisters in Oregon.   Gomez was sent to live with Fletcher when she was eight years old.   Fletcher molested Gomez while she was living at his home.   Gomez recalled that Lynch lived with MacWhorter and Fletcher and that Lynch was "not happy" being with these men and "begged [our] mom to [let him] come home."

{¶ 170}   In later years, Gomez and her family visited Lynch in Ohio. Since 1993, Lynch made periodic trips to Oregon and visited Gomez and other relatives. Gomez testified that Lynch is "a very kind person.   He would * * * give his shirt off his back to anyone that needed help.   In the years he's come out, this is what I've seen in my brother.   A very kind, gentle guy."

{¶ 171}   In closing remarks, Gomez told the jury, "I'm truly sorry.   * * * I can't know what the family is going through.   But I feel that God should make the decision of whether my brother should die."

{¶ 172}   Dr. Robert Tureen, a clinical psychologist, reviewed Lynch's records, conducted psychological testing of Lynch, and talked with two of his relatives.

{¶ 173}   Lynch was "in special education * * * from the 6th grade on, and he did very poorly in school."   Results of intelligence tests show that Lynch's mental functioning is on the borderline between the normal range of intelligence and the mentally retarded range, with a full-scale IQ of 72.

{¶ 174}   Test results showed that Lynch does not have a major mental disorder such as schizophrenia or bipolar disorder.   However, Lynch suffers from a mild cognitive dysfunction that indicates that "there's some brain disturbance which might interfere with academic learning over time."

{¶ 175}   Lynch dropped out of school around the ninth grade and went to work.   He worked in a shingle factory in Oregon, loaded trucks at a dog food factory in South Carolina, and then returned to Ohio. Lynch was employed at Rumpke for 19 years, changing tires and taking care of cars and trucks.

{¶ 176}   Lynch was married for eight or nine months in 1991, but that marriage was never consummated.   Lynch reports that he has been sexually impotent since the age of 20.   He once sought medical treatment for his impotence but could not afford the treatment.

{¶ 177}   Tureen diagnosed Lynch as suffering from chronic depression and pedophilia.   Lynch's own victimization as a child and his molestation of Love are consistent with this diagnosis.   However, Tureen cannot explain why Lynch killed Love. According to Tureen, "pedophiles, as a rule, are not physically aggressive to the children that they molest."

{¶ 178}  Tureen also concluded that Lynch is not psychotic but has some limitation in his intellectual functioning. However, Tureen stated, "I'm not trying to say that because he's got a low IQ, this happened or anything like that."

{¶ 179}  During cross-examination, Tureen reviewed Lynch's history of child molesting. These incidents included accusations that he molested young children at a church nursery, that he exposed himself to two young girls at a Toys R Us store in 1988, and that he committed sexual improprieties with a couple of his young cousins. Lynch was placed on probation for one year for exposing himself at the Toys R Us store. However, Lynch terminated his treatment and counseling two weeks after his probation ended.

{¶ 180}  Tureen also testified on cross-examination that Lynch stated that he "deserved to die" for what he did to Love. Lynch stated, "What I did runs against God's law and man's law."

{¶ 181}  Dr. Jill Bley, a clinical psychologist, administered tests and interviewed Lynch in conducting a psychological evaluation of him. In completing an Evaluation of Lifetime Stressors form, Lynch reported being abused by a female teacher when he was 14. Lynch also related that he and his sister were sexually abused by Fletcher and that Fletcher made him abuse his sister. On another occasion, Lynch was picked up by a man as he was coming home from the theater and was forced to have sex with him.

{¶ 182}  The Multiphasic Sex Inventory showed that Lynch scored "high on the child molest scale with much fantasy material about children." Lynch's responses showed that he used "cruising and grooming" to find his victims. Cruising means looking for a child that might easily be victimized, and grooming means being friendly and building a relationship with the potential victim. The test results also showed that Lynch was interested in young girls and had no interest in young boys.

{¶ 183}  Other tests confirmed that Lynch suffers from a post-traumatic stress disorder. According to Bley, Lynch suffers moderate to severe levels of impairment when he remembers his experiences with the female teacher who abused him and when he recalls being abused by Fletcher.

{¶ 184}  Bley testified that Lynch's history fits the pattern of a pedophile. Lynch's family was extremely dysfunctional. Lynch suffered from "roles and boundary confusion" because almost every important adult in his life betrayed him in some way. His father abandoned him, and his mother "gave him away twice into * * * prostitution." Moreover, Lynch was horribly ashamed and humiliated because he had been raped by a man. He views himself as flawed and definitely thinks of himself as bad.

{¶ 185} Bley testified that in her opinion, Lynch was totally preoccupied with his thoughts about young children but was "episodic rather than constant in his behavior." Lynch definitely understands the wrongfulness of his behavior. However, Bley cannot explain why Lynch killed Love, because pedophiles are usually "very withdrawn, almost milk toast." Moreover, Bley does not believe that Lynch understands why he killed Love, and Lynch "didn't offer an understanding of it."

{¶ 186} In an unsworn statement, Lynch told the jury, "I didn't mean to kill her, but I killed her. I did it and I don't know why I did it. I don't know what happened. I'm sorry it happened, and I'm sorry for the folks that I hurt." Lynch also said, "I tried to stop, you know, doing these things and I didn't succeed. * * * I'm just so sorry about it."

### Sentence evaluation

{¶ 187} We find nothing in the nature and circumstances of the offense to be mitigating. Lynch lured a six-year-old girl into his apartment. He took off her clothes, orally raped her, and strangled her when she started to scream. Lynch then disposed of her body in a nearby wooded area. The facts establish a horrific murder that lacks any mitigating features.

{¶ 188} Lynch's history and background provide some mitigating value. Lynch was raised by an illiterate mother who paid little attention to his well-being. There was little stability in his life, and he moved around a great deal while growing up.

{¶ 189} When he was young, Lynch was sexually abused by an older man with whom he had been sent to live in Oregon, sexually abused by a teacher, and raped by a passing motorist who gave him a ride. Undoubtedly, Lynch was traumatized by these experiences.

{¶ 190} Lynch also did very poorly in school and dropped out around the ninth grade. Despite his lack of schooling, Lynch worked at Rumpke for 19 years prior to these offenses.

{¶ 191} We find that the following statutory mitigating factors are inapplicable: R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(4) (youth of the offender); and (B)(6) (accomplice only).

{¶ 192} We conclude that the R.C. 2929.04(B)(5) factor (lack of a *significant* criminal history) is entitled to little weight, since Lynch was convicted of contributing to the delinquency of minors by exposing himself to two young girls. Otherwise, Lynch had no criminal record.

{¶ 193} We find that Lynch's intellectual deficiencies do not qualify as a mental disease or defect under R.C. 2929.04(B)(3). See *State v. Gumm* (1995), 73 Ohio St.3d 413, 432, 653 N.E.2d 253. However, Lynch's limited intellectual

abilities are entitled to considerable weight in mitigation under R.C. 2929.04(B)(7). Tests show that Lynch has an IQ of 72, which places him in the borderline range of intellectual functioning. However, the evidence at trial did not establish that Lynch was mentally retarded. Thus, based on the record before us, Lynch's execution is not barred by *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335; see, also, *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

{¶ 194}  Lynch's unsworn statement provided only slight mitigation. Lynch stated that he "didn't mean to kill" Love and that he is "sorry it happened, and * * * sorry for the folks that I hurt."

{¶ 195}  Upon independent weighing, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Undoubtedly, Lynch's intellectual deficiencies are entitled to significant weight in mitigation. Moreover, Lynch's dysfunctional family history, his frequent victimization as a sexually abused child, and his lengthy employment history merit some consideration. However, these factors are outweighed by the aggravating circumstances of rape, kidnapping, and murder of a six-year-old girl. Therefore, we find that the death sentence in this case is appropriate.

{¶ 196}  Finally, we find that the death penalty is proportionate to death sentences approved in similar cases. For rape-murders, see *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643 (three-year-old victim); for kidnapping-murders, see *State v. Hartman*, 93 Ohio St.3d 274, 754 N.E.2d 1150; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795 (11–year–old victim); for murders to escape detection, see *State v. Lawson*, 64 Ohio St.3d 336, 595 N.E.2d 902; and for the murder of a child under 13, see *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221 (six-month-old victim).

{¶ 197}  Accordingly, we affirm Lynch's convictions and sentence of death.

Judgment affirmed.

RESNICK, F.E. SWEENEY, PFEIFER, WOLFF, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

WILLIAM H. WOLFF JR., J., of the Second Appellate District, sitting for COOK, J.

---

Michael K. Allen, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr., Assistant Prosecuting Attorney, for appellee.

Elizabeth E. Agar and Herbert E. Freeman, for appellant.