JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Clyde Sledge, III, appeals from the judgment of the Common Pleas Court, rendered after a bench trial, finding him guilty of endangering children and felonious assault. Sledge contends that the manifest weight of the evidence did not support his convictions. Finding no merit to his appeal, we affirm.
 {¶ 2} The record reflects that the Cuyahoga County Grand Jury indicted Sledge in April 2002 on one count of endangering children, in violation of R.C. 2929.22, and one count of felonious assault, in violation of R.C. 2903.11. The indictment arose out of injuries sustained by Sledge's seven-month-old son. Sledge waived a jury trial and the case proceeded to a bench trial.
 {¶ 3} At trial, Tomiko Chatman testified that she and Sledge went to sleep at approximately 10 p.m. on April 15, 2002. According to Chatman, in the morning, Sledge told her that he had tried to wake her up at approximately 4 a.m. because their seven-month-old son, Clyde Sledge, IV, (also known as Caesar), was crying. Chatman, who was six months pregnant at the time, sat up, but then lay back down and went back to sleep.
 {¶ 4} When Chatman picked up Caesar in the morning, she noticed that he had a black eye and scratches on his head, his lips were swollen, and he felt feverishly hot. Chatman also noticed that both of his ears were "bitten up." When Chatman asked Sledge about Caesar's injuries, Sledge told her that he had gotten up in the middle of the night to give Caesar a bottle and then had taken him in the bathroom to burp him. As he was sitting on the toilet holding Caesar, he dozed off and Caesar fell out of his arms, striking his face and head on a metal magazine rack. When Chatman asked Sledge about Caesar's ears, he told her that when the baby would not stop crying, he bit his ears to "giv[e] him something to cry for." Sledge also told her that when Caesar kept crying, "he put him in the bend of his arms, and he squeezed him until he had stopped crying." According to Chatman, Sledge also told her that "he had really fucked him up this time."
 {¶ 5} Chatman, who admitted that she and Sledge had been involved in previous physical altercations, testified that she wanted to take Caesar, who was abnormally lethargic and listless over the next several days, to the hospital, but was afraid to do so because Sledge told her that "he would fuck me up, and he would whip my ass" if she did so. Sledge also told her that the medical personnel would accuse her of abusing her child and would take Caesar and her daughter, Terrace Chatman, away from her.
 {¶ 6} Two days later, however, when Sledge was away from the apartment, Chatman called 911 from a payphone. Caesar was subsequently admitted to the hospital, where he remained for 23 days.
 {¶ 7} Terrace Chatman, Tomika's seven-year-old daughter, testified that during the night of April 15, 2002, she awoke in her bedroom and heard Caesar crying. She heard Clyde tell Caesar several times to "shut it up" and then heard him "body-slam" the baby several times against a beanbag chair. Terrace testified that she recognized the sound because she had seen Sledge "body-slam" Caesar into the beanbag chair before. Terrace then heard Sledge "sucking" on Caesar's ears; a sound she recognized because she had seen Sledge suck on Caesar's ears on other occasions. Terrace testified that she then heard a "boom" sound from the bathroom.
 {¶ 8} Dr. Lia Lowrie, medical director of the Intensive Care Unit at Rainbow Babies and Children's Hospital, testified that Caesar was admitted with respiratory failure and a staph infection. In addition, two of his ribs were fractured, his ears were cut, swollen and oozing, and his back was bruised. Dr. Lowrie testified that the bruising on Caesar's back was consistent with finger marks that occur when a child is held forcibly and not consistent with a fall on a flat surface like a bathroom floor. In addition, she testified that she suspected that Caesar's ears were either cut or bitten and that the injuries to his ears were not consistent with a fall of a short distance off a toilet seat.
 {¶ 9} Sledge was arrested several days later. Cleveland Police Officer Steve Loomis testified that when he arrested Sledge and informed him that Caesar was in the hospital on life-support systems, Sledge claimed to have no knowledge that Caesar had been injured. Sledge told Loomis that he had last seen Caesar at 7 a.m. on April 16 and he was fine at that time. When Officer Loomis asked Sledge if he was concerned about Caesar being in the hospital, Sledge responded, "What the fuck am I supposed to be doing, crying?"
 {¶ 10} Sledge testified, however, that he never made these statements to Officer Loomis. He also claimed that Tomika's and Terrace's testimony about how Caesar was injured was not true, although he could not give any reason for their motivation to lie.
 {¶ 11} Sledge testified that he awoke at approximately 1:45 a.m. on April 16, 2002 and heard Caesar crying. When he was unable to wake Tomika, he got up to feed Caesar a bottle. Sledge testified that when Caesar finished the bottle, he burped him. He then took him into the bathroom to find a cloth to wipe his mouth. According to Sledge, the faucet in the bathroom did not work, so he bent down to get some water from the tub:
 {¶ 12} "I was standing up. So, I'm bending over and running some water over the rag. And when I did that, I wiped his mouth. And when I wiped up under his neck, he was just like this, and I tried to catch him. And he flipped out of my arms. * * * I had my back towards the sink, facing the wall where the book rack was at. And when I had wiped his mouth up and under his neck he just flipped. And when he flipped, he hit like that. And then the rack just flipped over him."
 {¶ 13} The trial court subsequently found Sledge guilty of endangering children and felonious assault and sentenced him to six years incarceration on each count, to be served concurrently.
 {¶ 14} In his single assignment of error, Sledge contends that the manifest weight of the evidence did not support his convictions.
 {¶ 15} A manifest weight challenge questions whether the State has met its burden of persuasion.[1] State v.Thompkins (1997), 78 Ohio St.3d 380, 390. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." Id. "Weight is not a question of mathematics, but depends on its effect in inducing belief." Id. When a defendant asserts that his or her conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 16} Sledge was convicted of endangering children and felonious assault. R.C. 2919.22(B), regarding endangering children, provides, in pertinent part, that "No person shall * * * torture or cruelly abuse" a child under eighteen years of age.
 {¶ 17} R.C. 2903.11, regarding felonious assault, provides that "No person shall knowingly * * * (1) cause serious physical harm to another or to another's unborn * * *." Serious physical harm is defined as "(a) any * * * condition of such gravity as would normally require hospitalization * * *; (b) any physical harm that carries a substantial risk of death; (c) any physical harm that involves * * * some temporary, substantial incapacity; (d) any physical harm that involves some * * * temporary, serious disfigurement; (e) any physical harm that involves * * * any degree of prolonged or intractable pain." R.C. 2901.01(A)(5).
 {¶ 18} Sledge contends that the State did not prove every element of these offenses because there was not enough evidence that he "knowingly" caused serious physical harm to his child or that he "tortured or cruelly abused" his son. Sledge contends that the weight of the evidence supports his testimony that the injuries to Caesar were accidental. We disagree.
 {¶ 19} In this case, the record demonstrates a plethora of evidence to support Sledge's convictions. Terrace Chatman testified that she heard Sledge tell Caesar to "shut it up" and then heard him "body-slam" him several times against a beanbag chair. She also testified that she heard Sledge "sucking" on Caesar's ears and then heard a "boom" sound. Contrary to Sledge's argument, the fact that she testified to what she heard, rather than what she saw, does not make her testimony unreliable or inconsistent.
 {¶ 20} In addition, Tomika Chatman testified that Sledge admitted to her that he bit the child's ears. In fact, he told her that when the baby would not stop crying, he bit his ears to "giv[e] him something to cry for." Tomika also testified that Sledge told her that he put Caesar in the bend of his arm and then squeezed him until he stopped crying. Sledge also told Tomika, referring to Caesar, that he "really fucked him up this time."
 {¶ 21} Sledge contends that Tomika's testimony is suspect, however, because she failed to seek medical attention for Caesar for three days. We find this attempt to impugn Tomika's credibility unpersuasive.
 {¶ 22} Tomika, who admitted that Sledge had previously beaten her up, testified that Sledge told her that if she took Caesar to the hospital, he would "whip [her] ass." He also told her that the medical personnel would likely accuse her of child abuse and take her children away from her. Thus, although her decision not to seek immediate medical attention for her child was ill-advised, it was obviously influenced by Sledge. Her fear of Sledge and the consequences of his abusive personality played a significant role in her reticence to seek medical attention in a timely manner. Moreover, we note that although Sledge testified at trial that Tomika was lying about how Caesar was injured, he could give no reasons for her motivation to lie.
 {¶ 23} Our review of the record indicates that Sledge's credibility, rather than Chatman's, is open to suspicion. First, although Sledge testified that after Caesar was injured he lay down next to him and stayed awake with him all night because he was so concerned about him, Cleveland Police Officer Steve Loomis testified that when he arrested Sledge several days later and informed him that Caesar was in the hospital on life-support systems, Sledge claimed to have no knowledge that Caesar had been injured or that he should be concerned about his welfare.
 {¶ 24} In addition, Dr. Lowrie's testimony contradicted Sledge's explanation regarding how Caesar was injured. Dr. Lowrie testified that although she could not definitely say Caesar's ears had been bitten, in light of her training and with a reasonable degree of medical certainty, her opinion was that his ears had either been cut or bitten. In addition, Dr. Lowrie testified that the bruising on Caesar's back was not consistent with a fall of a short distance but was more consistent with bruising caused by fingers when a child is held forcibly. Moreover, although Dr. Lowrie testified that Caesar's ribs were in various stages of healing, which meant that the injuries could have taken place earlier, she also testified that the rib fractures were consistent with being "body-slammed" against a beanbag chair, as Terrace testified she heard Sledge do to Caesar several times during the night of April 15, 2002.
 {¶ 25} In short, in light of the testimony from the State's witnesses, Sledge's version of how Caesar was injured is simply not believable. His contention that the child "flipped out" of his arms and fell face-down into a magazine rack is wholly inconsistent with the injuries sustained by the child.
 {¶ 26} Sledge contends that even though the weight of the evidence did not support his convictions, the "volume of the testimony put forth by the prosecution simply overwhelmed the testimony of the only eyewitness to the events which caused the injuries to the child." As the State correctly points out, however, the issue is not the quantity of the evidence but the quality. Here, the judge chose to believe the prosecution witnesses rather than Sledge. We find nothing in the record to indicate that in doing so, she lost her way and created such a manifest miscarriage of justice that Sledge's convictions must be reversed. Rather, the record reveals substantial evidence from which the judge could have concluded, beyond a reasonable doubt, that Sledge knowingly abused his child and caused him serious physical harm.
 {¶ 27} Appellant's assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J., and Calabrese, Jr., J., concur.
[1] Contrary to Sledge's assertion, the test for thesufficiency of the evidence and the manifest weight of the evidence are not the same. See State v. Thompkins (1997),78 Ohio St.3d 380, paragraph two of the syllabus ("The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.") Moreover, contrary to the State's assertion that an appeals court reviewing a manifest weight claim does not sit as a "thirteenth juror," "when a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 387.