[Cite as *State v. Bryant*, 2011-Ohio-2033.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 95220

---

# STATE OF OHIO

### PLAINTIFF-APPELLEE

### vs.

# WILLIAM BRYANT

### DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-518876

**BEFORE:**     Sweeney, J., Boyle, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:**     April 28, 2011

**ATTORNEY FOR APPELLANT**

Patrick E. Talty, Esq.
20325 Center Ridge Road, Suite 512 M
Rocky River, Ohio 44116

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: Kerry A. Sowul, Esq.
Assistant County Prosecutor
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶ 1}   Defendant-appellant William Bryant ("defendant") appeals his convictions of aggravated murder, aggravated burglary, and aggravated robbery associated with the deaths of Mary Hopko and Maria Slivka.   After reviewing the facts of the case and pertinent law, we affirm.

{¶ 2}   On December 6, 2006, representatives from the Maple Heights Senior Center received no response after knocking on the door of 81-year-old Hopko, who was scheduled to attend an event sponsored by the center.   The next day, December 7, 2006, the police found Hopko dead in her house, lying on the hall floor at the bottom of the staircase to the attic.

There were multiple lacerations on her head and face, including visible skull fractures. Blood spatter stains were found throughout the area and there was a large quantity of blood on the floor, some of which had seeped down into the basement.

{¶ 3} Investigators initially thought Hopko died accidentally after falling down the stairs. An autopsy was conducted on December 8, 2006, and the coroner's initial opinion, based on what he was told by investigators, was that this was an "accidental fall" case. No official ruling on the manner or cause of death was released from the coroner's office at this time.

{¶ 4} On January 1, 2007, friends of 80-year-old Slivka contacted the Garfield Heights Police Department because Slivka did not show up at a New Year's Eve party and nobody could reach her. The police found Slivka's body on her bedroom floor wrapped in a blanket. Slivka's head and the left side of her face had been severely beaten and were covered in dry blood. A hammer with blood and hair in its claw was found on the stairs. Additionally, the house had been "ransacked" and there were blood spatters and stains throughout.

{¶ 5} An autopsy was conducted on January 2, 2007. The coroner determined that the cause of death was "[m]ultiple blunt impacts to head with brain, skeletal and soft tissue injuries," and ruled this case a homicide. A subsequent inventory of Slivka's house showed that jewelry, cash, and a key she normally kept in the milk chute were missing.

{¶ 6} During the investigation of Slivka's death, the Garfield Heights Police discovered that Slivka and Hopko were friends, which triggered the Maple Heights Police to begin an investigation in Hopko's case. By January 3, 2007, a connection was made between the similarities of Hopko's and Slivka's deaths. According to relatives of both victims, the two women had used defendant's services as a handyman within a short time prior to their respective deaths.

{¶ 7} After reviewing Hopko's autopsy protocol, the coroner concluded that Hopko's death was a homicide, caused by "[b]lunt impacts to head, trunk and extremities with skull fractures and lacerations and contusions of brain." The Hopko investigation also revealed that jewelry and cash were missing from her house.

{¶ 8} Telephone records revealed that more than 30 calls were placed between defendant's and Hopko's phones from November 8 through December 5, 2006.

{¶ 9} Additionally, in November and December of 2006, more than 50 calls were placed between Slivka's and defendant's phones, the last of which was on December 29, 2006.

{¶ 10} A witness saw defendant inside Slivka's home with her on December 29, 2006. Slivka's neighbors saw a truck, later identified as defendant's, pull into Slivka's driveway on December 30, 2006 and parked in her driveway the morning of January 1, 2007.

{¶ 11} The police first spoke with defendant on January 3, 2007. Defendant

admitted recently working at both victims' houses but stated that the last time he saw Slivka was in early December, which was inconsistent with statements from witnesses who saw defendant and/or his truck at Slivka's house within the last few days. Defendant was arrested for both murders on January 3, 2007.

{¶ 12} Pursuant to a warrant, the police searched defendant's truck on January 3, 2007 and found the following items: keys to Hopko's 1986 Ford LTD; keys to Slivka's house; a crowbar with blood on the claw that contained a DNA mixture consistent with DNA from Hopko and Slivka; a receipt dated December 30, 2006, for coins and jewelry that defendant sold to a pawn shop, some of which was later identified as belonging to Hopko; a jewelry box containing rose colored gold rings that belonged to Slivka.

{¶ 13} On January 5, 2007, defendant spoke with the police again, eventually making the following statement: "I didn't do this alone."

{¶ 14} On February 5, 2007, defendant was charged with multiple felonies associated with the two murders. On December 11, 2007, defendant was referred to the court psychiatric clinic for a competency evaluation. Defendant was found competent to stand trial, although it was determined that he was mildly mentally retarded. On September 8, 2009, after almost two years of legal proceedings and continuances related to defendant's mental capacity, the court granted his motion to preclude the state from seeking death penalty specifications against him.

{¶ 15} On September 24, 2009, defendant filed a motion to suppress the statements he made to police on January 3 and 5, 2007, alleging that he "lacked capacity to execute a knowing, voluntary, and intelligent waiver of his right" to remain silent. On April 26, 2010, the court denied this motion to suppress. Defendant's trial began the next day.

{¶ 16} On May 6, 2010, a jury found defendant guilty of aggravated murder, aggravated burglary, aggravated robbery, kidnapping, and possessing criminal tools in relation to the killings of Hopko and Slivka. On May 24, 2010, the court sentenced defendant to life in prison without the possibility of parole.

{¶ 17} Defendant appeals and raises three assignments of error, the first two of which we review together.

{¶ 18} "I. The trial court erred in denying appellant's motion for acquittal where the evidence is not sufficient to support conviction."

{¶ 19} "II. "The verdict of the jury finding defendant-appellant guilty is against the manifest weight of the evidence."

{¶ 20} Specifically as to the sufficiency of the evidence against him, defendant argues that there was no evidence of theft to support the burglary and robbery charges, or to serve as the predicate felony for the aggravated murder charges. Additionally, defendant argues that "the volume of the testimony put forth by the prosecution simply overwhelmed the jury."

{¶ 21} Specifically as to the weight of the evidence against him, defendant argues that

Hopko's death was initially thought to be an accidental fall down the stairs. Defendant also argues that the trace evidence, such as hair samples, was inconsistent with the theory that he killed Slivka.

{¶ 22} When reviewing sufficiency of the evidence, an appellate court must determine, "after viewing the evidence in a light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

{¶ 23} The proper test for an appellate court reviewing a manifest weight of the evidence claim is as follows:

{¶ 24} "The appellate court sits as the 'thirteenth juror' and, reviewing the entire record, weighs all the reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 25} Aggravated burglary is defined in R.C. 2911.01(A)(1) in pertinent part as follows: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person * * * is present, with the purpose to commit * * * any criminal offense, if * * * [t]he offender inflicts * * * physical harm on another * * *."

{¶ 26} Aggravated robbery is defined in R.C. 2911.01(A)(3) in pertinent part as

follows: "No person, in attempting or committing a theft offense * * * shall * * * [i]nflict * * * serious physical harm on another."

{¶ 27} Felony murder is defined in R.C. 2903.01(B) in part as follows: "No person shall purposely cause the death of another * * * while committing * * * or while fleeing immediately after committing * * * kidnapping, * * * aggravated robbery, * * * [or] aggravated burglary * * *."

{¶ 28} In the instant case, there is sufficient circumstantial evidence that defendant committed a theft offense inside each victim's home. "It is * * * well-settled under Ohio law that a defendant may be convicted solely on the basis of circumstantial evidence," which has no less value than real or direct evidence. *State v. Nicely* (1988), 39 Ohio St.3d 147, 151, 529 N.E.2d 1236.

{¶ 29} Police found items belonging to Hopko and Slivka in defendant's truck two days after discovering Slivka's body. The items included Hopko's car keys and Slivka's house keys, pieces of Slivka's jewelry, and a pawn shop receipt for the sale of Hopko's jewelry. Additionally, there was cash missing from both victims' homes.

{¶ 30} The crowbar found in the bed of defendant's truck had blood on the claw that was consistent with Hopko's and Slivka's DNA. The coroner testified that Hopko's and Slivka's fatal injuries were consistent with injuries caused by a crowbar. Hopko's DNA was found on a sweatshirt that was recovered from defendant's garage. Telephone records show

numerous phone calls between defendant and both victims that abruptly stopped within two to three days before each victim's body was discovered.

{¶ 31} In looking at this evidence in a light most favorable to the state, as we must, it is reasonable to conclude that defendant committed a theft offense against both victims.

{¶ 32} This court has rejected criminal defendants' arguments that the volume of the state's testimony overwhelmed the jury, holding that "the issue is not the quantity of the evidence but the quality." *State v. Sledge*, Cuyahoga App. No. 83093, 2004-Ohio-2157, ¶ 26. Accordingly, the evidence against defendant is sufficient to convict him of the aggravated burglary, robbery, and murder charges. Defendant's first assignment of error is overruled.

{¶ 33} In support of his argument that his conviction for murdering Hopko is against the weight of the evidence, defendant points to the investigators' initial opinion that her death was caused by an accidental fall down the stairs. The coroner's internal paperwork, entitled "Death Scene Investigation Form" and dated December 7, 2006, lists Hopko's death as a "probable accident."

{¶ 34} Trial testimony showed that the Death Scene Investigation program was new to the Cuyahoga County Coroner's Office, with the first case being investigated in October of 2006. The Hopko-Slivka case was the first time the Maple Heights and Garfield Heights Police Departments worked with death scene investigators from the coroner's office. Once

the connection was made between Slivka's death and Hopko's death, the Hopko case was re-examined as a homicide.

{¶ 35} The coroner who performed the autopsy and the special agent for the Ohio Bureau of Criminal Identification and Investigation determined that the blood spatter evidence found at the Hopko scene was consistent with multiple blows to the head, rather than falling down the stairs. Additionally, investigators recovered small fragments of Hopko's skull scattered at the scene, and the coroner testified that, "I've never seen a fall down the staircase that produced fragments of skull lying loose at the scene." The coroner and the BCI investigator concluded that the manner of Hopko's death was homicide.

{¶ 36} Regarding Slivka's death, defendant argues that human hair collected from defendant's truck did not match Slivka's hair and a pair of defendant's shoes tested negative for blood. However, Slivka's DNA was on the hammer found in her house and the crowbar found in defendant's truck. Slivka's house keys and jewelry were also found in defendant's truck. Phone records and eyewitness testimony show that defendant had contact with Slivka shortly before her death.

{¶ 37} In reviewing this evidence, we cannot say that the jury lost its way in convicting defendant of killing Hopko and Slivka, and defendant's second assignment of error is overruled.

{¶ 38} In defendant's third and final assignment of error, he argues as follows:

{¶ 39} "III. The trial court erred in not suppressing custodial statements of defendant-appellant."

{¶ 40} "Appellate review of a trial court's ruling on a motion to suppress presents mixed questions of law and fact. An appellate court is to accept the trial court's factual findings unless they are clearly erroneous. We are therefore required to accept the factual determinations of a trial court if they are supported by competent and credible evidence. The application of the law to those facts, however, is subject to de novo review." *State v. Polk*, Cuyahoga App. No. 84361, 2005-Ohio-774, ¶2.

{¶ 41} To protect a suspect's Fifth Amendment privilege against self-incrimination, the law holds that statements made during a custodial interrogation may be used against the suspect only if he or she voluntarily, knowingly, and intelligently waived his or her right to remain silent. *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 42} In the instant case, defendant argues that he "was not capable of knowingly and intelligently waiving his *Miranda* rights." Defendant does not challenge whether his *Miranda* waiver was voluntary. Nonetheless, we take guidance from the Ohio Supreme Court's decision in *State v. Lynch*, which states that "[d]eficient intelligence is but one factor in the 'totality of circumstances' to be considered in determining the voluntariness of a confession." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶55. Other factors include the following: "the age, mentality, and prior criminal experience of the accused; the

length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Green*, 90 Ohio St.3d 352, 366, 2000-Ohio-182, 738 N.E.2d 1208, (quoting *State v. Edwards* (1976), 48 Ohio St.2d 31, 358 N.E.2d 1051, reversed on other grounds).

{¶ 43} In the instant case, the court held a suppression hearing, at which Garfield Heights Police Detective Carl Biegacki, who spoke with defendant on January 5, 2007, testified. The court also heard testimony from Dr. John Fabian, the forensic and clinical psychologist who evaluated defendant's mental state regarding his competency to stand trial, the death penalty specifications against him, and the waiver of his *Miranda* rights. Additionally, the court viewed the videotape of defendant's January 5, 2007 statements to police.

{¶ 44} Det. Biegacki testified that he first spoke with defendant on January 3, 2007. Defendant signed a written statement that he had not seen Slivka in three or four weeks, which was inconsistent with evidence that he was with her at her house at the end of December. At this point, Det. Biegacki considered defendant a suspect and advised him of his *Miranda* rights. Defendant signed a written waiver of those rights. Defendant continued to deny being at Slivka's house near the time she was murdered. The police arrested defendant and did not speak with him again until two days later.

{¶ 45} On January 5, 2007, the police again advised defendant of his *Miranda* rights

and defendant again waived those rights in writing. Defendant's main concern in this interview was not being able to call his girlfriend. Defendant asked Det. Biegacki if the police would be mad at him if he asked for an attorney. Det. Biegacki replied, "It's up to you." Defendant requested an attorney and the interrogation stopped. However, approximately 30 minutes later, defendant requested to speak to the police again.

{¶ 46} Defendant was brought back to the interview room and almost immediately, he requested an attorney again. Det. Biegacki told defendant that if he wanted to talk, they would talk, but if he wanted an attorney, the police could not talk to him. Defendant stated, "Can I tell you guys something off the record?" The police did not respond to defendant's question. Defendant told the police that he committed the crime, but he did not do it alone.

{¶ 47} Det. Biegacki testified that defendant did not appear to be suffering from a mental impairment or deficiency. According to Det. Biegacki, defendant gave the police no indication that he did not understand his rights, or the concept of waiving them, other than requesting his glasses during one of the interviews so he could read the written forms. The police supplied defendant with a pair of reading glasses, and defendant reviewed and signed the waiver.

{¶ 48} Dr. Fabian spent approximately 12 hours interviewing and administering tests to defendant regarding three mental health issues: defendant's competency to stand trial; whether defendant was a mentally retarded offender, and thus ineligible for the death penalty; and

defendant's capacity to waive his *Miranda* rights.

{¶ 49} According to Dr. Fabian, in the context of waiving Miranda rights, "knowingly" refers to understanding the rights themselves and "intelligently" refers to understanding the consequences of the waiver. However, the tests that Dr. Fabian administered to defendant measured his ability to understand *Miranda* rights; Dr. Fabian did not render an opinion on the ultimate issue of whether defendant validly waived his *Miranda* rights on January 5, 2007.

{¶ 50} Dr. Fabian testified that defendant is mildly mentally retarded, which may affect his capacity to understand *Miranda* rights at two levels: First, "cognitive impairments and deficits," such as "thinking, attention, memory, [and] ability to understand language"; and second, "social adaptive skills," such as wanting to please people who have authority and being unable to understand the nature of an adversarial situation.

{¶ 51} Dr. Fabian further opined that having a sixth to seventh grade reading level "is the threshold of ability to basically understand *Miranda* waivers." Dr. Fabian concluded that defendant tested at a first or second grade level of reading. Dr. Fabian also noted a "convergent validity," meaning that defendant performed at different levels in the various assessments administered to him, scoring as high as a fifth or sixth grade level in categories relating to oral comprehension.

{¶ 52} In denying defendant's motion to suppress, the court found that defendant's statement that "I didn't do this alone" was not made in response to a specific question.

Rather, defendant volunteered this inculpatory statement after he initiated further contact with the police on January 5, 2007. The court found that defendant's developmental disability was not a major factor in waiving his *Miranda* rights and that nothing in the record indicated "that the detectives had any idea that [defendant] was mildly mentally retarded or developmentally disabled." The court further found that the police did not coerce defendant; instead, the police's treatment of defendant was "[i]f anything * * * rather cautious."

{¶ 53} The court's findings and applicable law support that defendant knowingly and intelligently waived his *Miranda* rights and voluntarily spoke with the police. The court did not err in denying defendant's motion to suppress and his third assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to

Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, JUDGE

MARY J. BOYLE, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR